NATIONAL-STANDARD COMPANY *v.*
DEPARTMENT OF TREASURY

AMERICAN STANDARD INC. *v.* STATE OF MICHIGAN

1. WORDS AND PHRASES—ACCOUNTANT—CERTIFIED PUBLIC ACCOUNTANT.
   An accountant is an expert in explaining the financial condition of a corporation and a certified public accountant is a professional who has been examined and licensed to practice in much the same manner as doctors or lawyers.

2. WITNESSES—CERTIFIED PUBLIC ACCOUNTANT—OPINIONS.
   Because of their professional competence, the opinions of certified public accountants are entitled to be given great weight and their expert testimony should be carefully considered just as that of an expert in medicine, dentistry, engineering, science, technology, or other specialized areas of knowledge or professional competence.

3. CORPORATIONS—FRANCHISE PRIVILEGE FEE—SURPLUS—STATUTES.
   The state, in making its determination of the franchise privilege fee, is bound by the directive of the privilege fee statute and is not bound to follow the accepted standards for corporate accounting as to what constitutes capital, indebtedness, surplus, and so on, no matter how correct such standards may be as a matter of accounting principles as the delegation to private accountants or to certified public accountants of the power to determine surplus or capital or indebtedness, in lieu of a legislative standard set forth in the statute, would be clearly unconstitutional (MCLA § 450.304).

4. CORPORATIONS—FRANCHISE PRIVILEGE FEE—NET VALUE.
   The "net value of the corporation's property", of which the franchise privilege fee statute speaks, is the net value as of

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 1 Am Jur 2d, Accountants § 1.
  Regulation of accountants. 70 ALR2d 433.
[2] 31 Am Jur 2d, Expert and Opinion Evidence § 26 *et seq.*
[3] 51 Am Jur, Taxation § 824 *et seq.*
[4] 51 Am Jur, Taxation § 699 *et seq.*
[5–13] 51 Am Jur, Taxation § 793 *et seq.*

the close of the reporting period shown on the annual report of a corporation, which is present value (MCLA § 450.304).

5. CORPORATIONS—FRANCHISE PRIVILEGE FEE—SURPLUS.

The determination of surplus for computing the franchise privilege fee is an administrative or quasi-judicial function which must be made in each case based upon the facts of that case.

6. APPEAL AND ERROR—CORPORATIONS—FRANCHISE PRIVILEGE FEE.

On review of the determination of the franchise privilege fee, the Supreme Court determines whether findings of fact are supported by competent, material and substantial evidence on the whole record in deciding if errors of law have been committed (Const 1963, art 6, § 28).

7. CORPORATIONS—TREASURY SHARES.

Treasury shares of stock are those shares of paid-up capital a company has reacquired and is holding in its treasury.

8. CORPORATIONS—TREASURY STOCK—FRANCHISE PRIVILEGE FEE.

Treasury stock is an asset which the state may properly take into account in determining the tax base for the annual franchise privilege fee where a corporation had reacquired shares of its own par value common capital stock, which shares were to be used for general corporate purposes, including satisfaction of stock options, payment of bonuses or deferred compensation, acquisition of property, mergers, etc., and were not, at the time of their acquisition, dedicated or committed to any specific purpose.

9. CORPORATIONS—TREASURY STOCK—FRANCHISE PRIVILEGE FEE.

Treasury stock is an asset which the state may properly take into account in determining the tax base for the annual franchise privilege fee although shares of stock reacquired by a corporation were reflected in its annual balance sheets on the liability side as a reduction of "stockholders investment" and entitled "less capital stock reacquired and held in treasury at cost".

10. CORPORATIONS—ANNUAL REPORT—SUBSIDIARY CORPORATIONS—FINANCIAL STATEMENT—CONSOLIDATED BALANCE SHEETS.

A corporation may not file annual reports based on consolidated balance sheets of the corporation and its wholly-owned subsidiary corporations, but rather is required to file an unconsolidated financial statement (MCLA §§ 450.82, 450.304, 450-.305).

11. CORPORATIONS—FRANCHISE PRIVILEGE FEE—SUBSIDIARY CORPORA-
TIONS—STOCK—VALUE.

The net worth at which the stock of wholly-owned subsidiaries
was carried on the books of a parent corporation for the tax
years involved reflects current value, since the stock of the
subsidiaries is not on any stock exchange which would provide
a market value, and such current value should be used rather
than original cost for the computation of the annual franchise
privilege fee of the parent corporation.

12. CORPORATIONS—SURPLUS—FRANCHISE PRIVILEGE FEE—FUTURE
FEDERAL INCOME TAXES.

Surplus is to be determined for purposes of computing the annual
franchise privilege fee by deducting from the net value of
the corporation's property its outstanding indebtedness and
paid-up capital and future Federal income taxes are not an
outstanding indebtedness, they are a mere contingency.

13. TAXATION—CORPORATIONS—FRANCHISE PRIVILEGE FEE.

A corporation franchise privilege fee is an annual tax exacted
year by year for the privilege of doing business in the State
of Michigan and it must be annually determined on the basis
of the corporation's condition as it existed during the reporting
period.

Appeals from Corporation Tax Appeal Board and
from Court of Claims, William J. Beer, J., and from
Court of Appeals prior to decision. Submitted June
2, 1970, and June 4, 1970. (Nos. 2, 12 June Term
1970, Docket Nos. 52,500, 52,705.) Decided November
12, 1970. Rehearing denied February 1, 1971.

The Department of Treasury redetermined the
amount of annual privilege fees due from National-
Standard Company. Plaintiff National-Standard
appealed to the Corporation Tax Appeal Board. Affirmed.
Plaintiff appealed to the Court of Appeals
and applied to the Supreme Court for leave to appeal
prior to decision by the Court of Appeals.
Leave granted. Affirmed. (Docket No. 52,500.)

Complaint by American Standard Inc. against the
State of Michigan and the Department of Treasury

for refund of franchise privilege fees paid under pro-
test. Judgment for plaintiff. Defendants appealed
to the Court of Appeals and applied to the Supreme
Court for leave to appeal prior to decision by the
Court of Appeals. Leave granted. Reversed.
(Docket No. 52,705.)

*James M. Roche, McDermott, Will & Emery,* for
National-Standard Company.

*Dickinson, Wright, McKean & Cudlip (T. Donald
Wade* and *Ernest Getz,* of counsel), for American
Standard Inc.

*Frank J. Kelley,* Attorney General, *Robert A.
Derengoski,* Solicitor General, and *William D. Dex-
ter* and *Robert J. Taube,* Assistant Attorneys Gen-
eral, for defendants.

ADAMS, J.   These cases arose over the amount of
annual franchise privilege fees assessed against
American Standard Inc. for the years 1966 and 1967,
and National-Standard Company for the years 1962
through 1965, by the Corporation Franchise Fee
Division of the Department of Treasury, hereafter
referred to as the "State." The cases have been
combined for disposition in one opinion because of
similarity of issues.

In these franchise privilege fee cases, we are once
again confronted with the meaning of the word "sur-
plus," as defined and used in the statute. Section 4
of the statute (PA 1921, No 85, as amended [MCLA
§ 450.304; Stat Ann 1970 Cum Supp § 21.205]), reads
in part as follows:

"The term 'surplus', as used in this act, shall be
taken and deemed to mean the net value of the cor-
poration's property, less its outstanding indebted-
ness and paid-up capital;  *  *  *  ."

## I. FACTS AND PROCEEDINGS

American Standard Inc., a Delaware corporation, with principal offices in New York City, was admitted to do business in Michigan in 1939. Commencing in 1959, from time to time it reacquired shares of its own $5 par value common capital stock upon the open market or by invitation for tenders. On December 31, 1965, out of 11,709,934 shares then issued and outstanding, 1,717,509 shares had been reacquired and retained by the corporation. The shares reacquired had a par value of $8,587,545. The company had expended $30,771,784 for their reacquisition. On December 31, 1966, out of the same number of shares issued and outstanding, 1,705,259 were still retained by the corporation in its treasury. The par value of the shares retained on that date was $8,526,295. The company had expended $30,591,464 for their reacquisition. On both dates approximately 15% of the shares issued and outstanding were treasury or reacquired shares.

The treasury stock was to be used for general corporate purposes, including such possible purposes as satisfaction of stock options, payment of bonuses or deferred compensation, acquisition of property, mergers, etc. The treasury shares were not, at the time of their acquisition, dedicated or committed to any specific purpose. The company did not receive dividends upon the reacquired shares, did not vote them, and did not include them in the computation of earnings per share. American Standard's outstanding shares of capital stock are bought and sold regularly on the open market.

Prior to June, 1966, in computing the annual franchise privilege fee, the state's procedure for the treatment of treasury stock was to accept the classification of it as reported by the corporation on its balance sheet. If the corporation indicated the treas-

ury stock was an asset, it was treated as such in computing the franchise privilege fee base. If the corporation indicated the treasury stock constituted a reduction from earned surplus, the franchise privilege fee base was reduced accordingly.

In June, 1966, pursuant to a departmental ruling, treasury stock of all corporations was treated as an asset in determining the franchise privilege fee base. At the time of this change, all reporting corporations were advised by the state that if they promptly gave their treasury stock the status of authorized but unissued shares, such stock would retroactively be excluded from the 1966 franchise privilege fee base. American Standard continued to treat its treasury stock as a deduction from total stockholders' equity and did not treat the stock as outstanding or as an asset. The state included the treasury stock in the tax base at the amount American Standard had spent to reacquire it and assessed additional fees. American Standard paid the fees under protest. It obtained a judgment for refund in the Court of Claims.

The Court of Claims found as a physical and mathematical fact that the amounts taken from the corporation's surplus to reacquire its own stock reduced the surplus by that amount. The court further found as a fact that the treasury shares were not an asset for the purpose of computation of the tax base in determining the corporation's annual privilege fee. We granted leave to appeal prior to decision by the Court of Appeals. (383 Mich 768.)

National-Standard Company is a Delaware corporation authorized to do business in Michigan with its principal office at Niles, Michigan. There is no connection or relationship between it and American Standard Inc. National-Standard filed reports and paid an annual franchise privilege fee for 1962

through 1965. The annual reports originally filed constituted a consolidated balance sheet of the company and its six subsidiaries. They were consistent with the company's annual reports to its shareholders. In these reports, the average ratios used to allocate to Michigan a proportionate part of the company's paid-up capital and surplus were determined on the basis of the property, compensation and receipt factors of the company and its consolidated wholly-owned subsidiaries. The state notified National-Standard that the reports were unacceptable and that the privilege fee must be computed from reports prepared on an unconsolidated basis. The company then filed amended reports on an unconsolidated basis reflecting in its privilege fee base only its own net worth. For that purpose, National-Standard included its subsidiaries on the basis of its investment at original or historical costs in the shares of stock of each subsidiary. The state, in redetermination proceedings, concluded the value of the stock of the wholly-owned subsidiary corporations should be the present net worth of such stock as reflected by the books and accounts of National-Standard.

In making deficiency assessments, the state also included in the company's privilege fee base the reserves for deferred Federal income taxes which the company carried on its books and annual reports to stockholders under the liability section of its balance sheet. The company computed these deferred taxes by multiplying by prevailing corporate Federal income tax rates the difference between the accelerated depreciation taken by the company on its depreciable property for Federal income tax purposes and depreciation on such property computed on a straight-line basis.

Lastly, in determining the deficiency assessments, the state included in the corporation's privilege fee base for 1965, 2,800 shares of treasury stock reflected in the company's annual balance sheets on the liability side as a reduction of "Stockholders' investment" and entitled "Less capital stock reacquired and held in treasury, at cost-2,800 shares." These shares of $10 par value common stock had been reacquired by the company during its fiscal year ended September 30, 1964, at a cost of $92,955.39. On its books and in its annual report to shareholders for the fiscal year ended September 30, 1964, the company reflected these treasury shares as a reduction of its surplus. The state fixed the value of the treasury shares at the company's cost and included such value as a part of corporate assets for franchise privilege fee purposes for 1965.

The corporation took an appeal to the Corporation Tax Appeal Board from the redetermination made by the state. After hearing, that board rendered a decision that an additional privilege fee was owed in the sum of $23,225.37, plus interest. By order dated July 22, 1969, we granted leave to appeal from decision of the Corporation Tax Appeal Board prior to decision by the Court of Appeals.

## II. GENERAL PRINCIPLES

It is important to the decision of these cases to make clear at the outset that the issues do not involve the legality or illegality of corporate action under charter powers nor the application of statutory controls over the internal affairs of the corporation which relate to such things as voting rights, dividends, surplus or accounting. There is no issue of *ultra vires* or of fraud or deception on stockholders, investors or creditors. These appeals challenge only the method used by the state in computing the

amount of the annual franchise privilege fee imposed by Michigan on corporations, both foreign and domestic, for the privilege of doing business in this state.

Present day corporations are often enormous in size and complexity. Many of them carry on operations in every state in the Union, as well as in numerous foreign countries. It is impossible for this state literally to appraise corporate properties, determine outstanding indebtedness, examine into subsidiaries, and audit books to finally arrive at net value or surplus.

The problem was considered in *In re Appeal of Hoskins Manufacturing Co.* (1935), 270 Mich 592. Justice FEAD, writing for the entire Court, stated (p 596):

"As a general proposition, we think the State is justified in holding that the tax is determined from the corporate books. The statute does not provide, in express language or by authorization of expense, for the impractical procedure of audit and appraisal of each corporation each year by the State. It contemplates that the tax shall be found from the annual report of the corporation to the secretary of State, supplemented by the further facts demanded under Act No. 327, Pub. Acts 1931, § 82(o), and the detailed and exact information provided for in 2 Comp. Laws 1929, § 10143. Obviously, the source of information and facts is the corporate books, which the statute assumes, and requires, shall be kept correctly."

The books and records of a corporation are a mere assemblage of facts and figures. When differences of opinion arise as to the treatment of an item, how it shall be interpreted becomes all important. Analysis of corporate books and records is mainly accomplished by the work of professional independ-

ent accountants or certified public accountants. Frank Thomas Weston, a general partner in the public accounting firm of Arthur Young & Company and its Director of Accounting and Auditing Standards, in *American Standard Inc.* v. *State of Michigan,* described the function of CPA's as follows:

"* * *  [O]ur function can be briefly described as the attest function whereby we examine or review the financial statements of a business entity and audit the underlying records and then *we express a professional opinion that the summarized statement, the balance sheet and the statement of income, is a fair presentation of the financial position* which consists of assets, liabilities and stockholder's equity, and the operating result of that entity for the period." (Emphasis added.)

The analysis of the corporation's books and records by certified public accountants was also described by Mr. Weston as follows:

"The language of the report which you see in most annual reports is phrased in a broad sense as *an opinion* of a professional firm that the balance sheet is a fair presentation—and those are critical words —of the financial position in accordance with generally accepted accounting principles, and this body of generally accepted accounting principles contains the sort of thing that says that inventories are carried at cost and the plant is written off over its estimated life—these are ground rules of accounting. And therefore *the professional opinion* that the auditor gives in these annual reports *says basically that the assets, liabilities and equity of this corporation or this consolidation of companies is fairly presented."* (Emphasis added.)

So an accountant is an expert in explaining the financial condition of a corporation, and a certified public accountant is a professional who has been

examined and licensed to practice in much the same manner as doctors or lawyers. The Accounting Principles Board of the American Institute of CPA's —an 18-man board—has been given the sole responsibility and authority by the profession to issue pronouncements on matters of accounting principles for the members of the profession.

Since "generally accepted accounting principles" are followed by accountants, and their work is widely used by businessmen, financial analysts, investors, security dealers, governmental agencies, and others, it is not surprising if it be contended that the meaning of "surplus" should be determined by the work of accountants. Consequently, the initial question in these cases is: Should the opinions of CPA's as to what constitutes capital, indebtedness, surplus, and so on, arrived at by the application of generally accepted accounting principles, control, or may the state disregard such opinions if, in the state's view, they are irreconcilable with the requirements of the corporation franchise fee statute?

Because of their professional competence, the opinions of certified public accountants are entitled to be given great weight. Their expert testimony should be carefully considered just as that of an expert in medicine, dentistry, engineering, science, technology, or other specialized areas of knowledge or professional competence. The state, in making its determination of the privilege fee, is bound, however, to follow not the accepted standards for corporate accounting, no matter how correct such standards may be as a matter of accounting principles, but rather the directive of the privilege fee statute. Delegation of the power to private accountants or to CPA's to determine surplus or capital or indebtedness, in lieu of a legislative standard set forth in the statute, would be clearly unconstitutional.

The correct principle to be applied has been recognized by all members of this Court in *McLouth Steel Corporation* v. *Corporation & Securities Commission* (1963), 372 Mich 76. In that case Justice T. M. Kavanagh stated (p 85):

"It should be clear, then, that it is the duty and obligation of the corporation and securities commission to arrive at the computation of the privilege fee, not alone from the balance sheet but from all the information it has and can acquire at the time of the determination. * * * Insofar as the trial court ruled that, in the absence of fraud or mistake, the commission is bound to consider only the balance sheet as a required part of the annual report for the purpose of computing the privilege fee, it was in error."

Justice Dethmers stated (p 89):

"* * * It is one thing to say, as in *Hoskins,* that the State is generally justified in determining the fee from the books of the corporation and that the latter cannot be heard to complain of that because it has prepared them, and quite another to say that the State is bound thereby. In fact, it is expressly stated by the Court in that case that the statute does not provide that the State shall accept as final the figures in the balance sheet filed by the corporation with respect to surplus, but that, 'from the annual report *and the other information obtained*' the State shall make a determination to be based 'upon the facts.'"

The "net value of the corporation's property," of which the statute speaks, is net value as of the close of the reporting period shown on the annual report— a present value. In most cases, the corporation's books, certified by experts whose profession it is to determine by accounting principles how to depict the status of the corporation, will no doubt be ac-

cepted by the state for assessment purposes. However, the determination of surplus is an administrative or quasi-judicial function[1] which must be made in each case based upon the facts of that case. On review, we determine whether findings of fact are supported by competent, material and substantial evidence on the whole record (art 6, § 28, Constitution of 1963) in deciding if errors of law have been committed.

### III. TREASURY STOCK

Treasury shares of stock are those shares of paid-up capital a company has reacquired and is holding in its treasury. There is expert testimony that, according to generally accepted accounting principles, treasury stock should not be carried as an asset. However, we believe reacquired stock of these companies to be company property that meets the statutory test. The case of American Standard illustrates the reasons why.

By December 31, 1965, $30,771,784 had been expended by American Standard out of surplus to reacquire 1,717,509 shares of common stock, the par value of which was $8,587,545. At this point it should be noted that a sum equal to the par value of the stock still remained a part of the paid-up capital of the company as it elected not to retire the reacquired shares. If the money had been spent to buy stock of another company, for the construction of an industrial plant, or for the acquisition of another business, the cash invested from American Standard's treasury would still be reflected on its books as an asset, having merely been altered to

---

[1] We have held that the statutory duty imposed on the members of the Corporation Tax Appeal Board is quasi-judicial in nature. *Detroit Edison Company* v. *Corporation & Securities Commission* (1960), 361 Mich 150.

another form of property. Because American Standard elected to reacquire its own stock for various purposes—satisfaction of stock options, payment of bonuses and deferred compensation or acquisition of property or for mergers with other corporations—it is contended that this cash asset has disappeared and will only reappear at such time as American Standard elects to sell or otherwise issue the stock. The sum of $30,771,784 of company surplus no longer exists but its substitute may be utilized at any moment to achieve corporate purposes as readily as could the same amount of cash!

The treasury stock in these cases has gone to market. The value of the stock can be determined from the day-to-day quotations appearing on the New York Stock Exchange. Since the stock has not been legally retired, that portion of the capital of the company represented by the par value of it is unaffected. The propriety of including an amount equivalent to the par value of American Standard's entire outstanding shares in computing the "paid-up capital" portion of the franchise privilege fee is not in dispute.

We conclude the treasury stock in these cases is an asset and that the state properly took it into account in determining the tax base for the annual franchise privilege fee.

No question is presented in these cases as to the correct figure to be used for the treasury stock—cost of acquisition or market value as of the date of the balance sheet. While the issue does arise as to the valuation of the stock of wholly-owned subsidiaries, we do not find it necessary to pass upon it here.

IV. CONSOLIDATED REPORTS AND VALUATION OF
STOCK OF WHOLLY-OWNED SUBSIDIARIES

As we have noted, National-Standard first filed consolidated balance sheets of it and its subsidiaries. The state determined that its annual reports were improperly filed and that, under the statute, the privilege fee had to be computed on the basis of unconsolidated balance sheets. The first question to be determined is whether a corporation may file annual reports based upon consolidated balance sheets of the corporation and its wholly-owned subsidiary corporations.

PA 1921, No 85, as amended, prescribes the fees, taxes and charges to be paid to the State of Michigan by corporations, both foreign and domestic; sets forth the method and basis of computation; requires reporting; and schedules the amounts required to be paid. Section 4 of the act, cited *supra*, contains the following:

"* * * [E]very profit corporation organized or doing business under the laws of this state, or having the privilege to do business, * * * shall pay, at the time of filing the annual report with the Michigan corporation and securities commission, as required by sections 81 and 82 of Act No 327 of the Public Acts of 1931, as amended * * * an annual fee of 5 mills upon each dollar of its paid-up capital and surplus * * * . * * * It is the intent of this section to impose the tax herein provided for upon every corporation, foreign or domestic, having the privilege of exercising corporate franchises within this state, irrespective of whether any such corporation chooses to actually exercise such privilege during any taxable period, * * * ."

Section 81 of PA 1931, No 327, noted in the above quotation, refers to non-profit corporations and is inapplicable.

Section 82, subd (m), PA 1931, No 327, as amended (MCLA 1970 Cum Supp § 450.82; Stat Ann 1970 Cum Supp § 21.82), provides that the report to be filed shall contain a "* * * statement of the assets and outstanding liabilities of the *corporation* * * * ." (Emphasis added.) In the provisions of the statute for the apportionment of the privilege fee base between Michigan and other states on the basis of the ratio of Michigan property and other criteria, the statute refers to the property, payroll and sales of "the taxpayer" (§ 5, PA 1921, No 85, as amended [MCLA § 450.305; Stat Ann 1970 Cum Supp § 21.208]).

During all or a portion of the reporting years involved, National-Standard's wholly-owned subsidiaries which it sought to include in its consolidated balance sheets accompanying the annual reports filed with the state were:

| Wholly-Owned Subsidiaries of National-Standard Company | Fiscal Year Ended September 30 | | | |
|---|---|---|---|---|
| | Year | Year | Year | Year |
| National-Standard Co. of Canada, Ltd. (an Ontario, Canada corporation) | 1961 | 1962 | 1963 | 1964 |
| National-Standard Co., Ltd. (an English corporation) | 1961 | 1962 | 1963 | 1964 |
| National-Standard, (S.A.) (a French company) | | | 1963 | 1964 |
| Cheney Bigelow Wire Works, Inc. (a Delaware corporation with principal offices in Springfield, Massachusetts) | | 1962 | 1963 | 1964 |

| Wholly-Owned Subsidiaries of National-Standard Company | Fiscal Year Ended September 30 Year Year Year Year |
|---|---|
| Multisonic Corp. (a New York corporation with principal offices in Westbury, New York) | 1964 |
| Reynolds Wire Co., (an Illinois corporation with principal offices in Dixon, Illinois) | 1961 1962 1963 1964 |

None of these subsidiary companies had been admitted to do business in Michigan.

As shown by the foregoing quotations from the statutes, the fees involved are assessed upon corporations having the privilege to do business in this state. That section alone would appear to exclude National-Standard from filing consolidated balance sheets for franchise privilege fee purposes. But additionally and of greater significance is the apparent legislative intent in drafting the statutes to embrace a single reporting corporation. Since all of the above provisions are in the singular, it must be concluded that a reporting corporation may not file a consolidated report with its wholly-owned subsidiaries but rather is required to file an unconsolidated financial statement.

From time to time, National-Standard purchased the stock of subsidiary companies. It contends that its original cost is the correct figure to be used on its unconsolidated statements. These figures of original costs could only be obtained by National-Standard by reference to books and records as of the date the stock of each subsidiary was acquired because the investment shown on the books at the

close of each balance sheet year was historical cost adjusted to show the amount of profit or loss the subsidiaries had experienced that year. This has resulted in a composite figure equal to the entire net worth of the subsidiaries at year end. The state contends the present equity ownership of National-Standard in its wholly-owned subsidiaries by virtue of National-Standard's ownership of their stock is the figure which reflects the current value (net worth) and which should be used on the unconsolidated statement.

For example, as of September 30, 1964, over various periods of time from June 23, 1919 to that date, National-Standard had invested $3,580,770.59 in its subsidiaries. This is the figure it would use. The stock investment, plus equity increase (earnings) in the subsidiaries on that date, is $4,642,483.36. This is the figure the state would use.

From discussion earlier in this opinion, it will be recalled that the problem in these cases is not to determine what is proper accounting, but rather to determine the net value of the corporation's property. Original cost is most unlikely to give this result unless a situation has remained completely static. With the passing of time, the value of stock may depreciate or it may increase. The difference in the figures in this case illustrates this very point.

In *In re Appeal of Hoskins Manufacturing Co., supra,* the question before this Court was the proper valuation for privilege fee purposes of the corporation's marketable investments. Its balance sheet showed " 'marketable investments—at cost less reserve, $671,447.38,' " with a notation thereunder " '(Approx. market value $378,200).' " (P 593.) In the annual privilege fee report, the investments were reflected at market value. The Court pointed out that on its books the corporation carried ledger ac-

counts showing both cost and market value. The Court adopted the lower market value as the appropriate figure.

The Court said (p 598):

"Undiscriminating adherence to some of the figures on a balance sheet cannot reasonably be made the measure of the tax. Because of the various reports and taxes required from corporations and the development of accounting and auditing along mysterious lines, the books and the balance sheet may have strange items and need interpreting."

Following the principle laid down in *Hoskins,* we agree with the state that the value of the stock of its subsidiaries owned by National-Standard is most accurately reflected by taking the value of those subsidiaries as shown to exist on the consolidated balance sheets of National-Standard. Since the stock of the subsidiaries is wholly-owned and not on any stock exchange which would provide a market value, the net worth at which it was carried on the books of National-Standard for the tax years reflects current value and should be used rather than original cost.

Finally, appellant argues that if it is required to include the entire net worth of the stock of each of its subsidiaries in the determination of its own net worth for franchise privilege fee purposes the result, in reality, amounts to consolidated reporting, if original cost for valuation purposes is rejected. Based on this premise, appellant charges the state with inconsistency since the state disapproved initial reports which the appellant had prepared on a consolidated basis. Appellant further complains that if its tax base is to include the value of the stock of its subsidiaries at the larger amount of net worth, rather than historical cost, the state in apportioning that base to Michigan by use of the three-factor

formula of property, compensation and receipts (appearing in § 5, PA 1921, No 85, as amended [CLS 1961, § 450.305; Stat Ann 1963 Rev § 21.208]), should apply the formula to the consolidated property, compensation and receipts of the appellant and its subsidiaries.

The Corporation Tax Appeal Board disposed of this issue in its decision in these words:

"The Appellant contends that if the investment in subsidiaries is part of the net worth and reflected as equity rather than cost, the 3-factor formula of property, payroll and receipts should be applied because practically all of the business of the subsidiaries is done outside Michigan. The principal offices of the Appellant are in Michigan; all of the correspondence exchanged between the company and the state regarding this appeal originated in Niles, Michigan, where its principal office is located; all of its officers, as indicated in its annual reports, reside in Niles, Michigan; and the Appellant employs the stock of the wholly-owned subsidiaries at its office in Niles, Michigan. Because the intangibles (subsidiary stock) is Michigan located property, the 3-factor formula should not be applied in computing the Appellant's privilege fee."

A further answer is to be found in the following provision of § 5, *supra:*

"In the case of computing the annual franchise fee prescribed by section 4 of this act, both as to domestic and foreign corporations, such computations shall be made   *   *   *   upon the entire paid-up capital and surplus of any corporation which does not maintain a regular place of business outside this state other than a statutory office."

If, as we have held, the subsidiary companies are not included in consolidation and, instead, appellant is required to report as a single corporation, on the

record before us the above-quoted provision would become applicable. We find no merit in these contentions of appellant.

## V. Reserve for Federal Income Taxes

The creation by National-Standard of a reserve for deferred federal income taxes presents a different question than was decided by this Court in *Consumers Power Company* v. *Michigan* (1970), 383 Mich 579. In that case, it was held that since the primary jurisdiction and control of electric utilities lies with the Public Service Commission, the accounting methods required or permitted by it shall control for determination of surplus. See also, *Corporation & Securities Commission* v. *Michigan Consolidated Gas Company* (1968), 381 Mich 116, and *Detroit Edison Company* v. *Corporation & Securities Commission* (1962), 367 Mich 104. The validity of mandatory or permissible requirements of the Public Service Commission pertaining to electric utilities' corporate surplus was never tested by these cases since it was found that the Corporation Franchise Fee Division of the Department of Treasury could not challenge the authority of the Public Service Commission in this regard.[2]

---

[2] It is worthy of note that the Public Service Commission in an order of June 13, 1963, following its investigation and hearings relative to the accounting and rate case treatment of depreciation methods provided by § 167 of the Internal Revenue Code of 1954, gave consideration to a proposed requirement that public utilities pass on to customers the so-called "savings" arising from the use of accelerated depreciation to reduce the amount of Federal income taxes otherwise payable. The commission concluded that if such a requirement were formalized, it would result in a rate reduction during the period of tax savings but in the later years of property life a rate increase would be necessary to meet increased Federal income tax expense. The turnover in customers receiving service over the period of any such tax adjustment was one of the reasons why the commission rejected such treatment of the tax savings as undesirable.

The reserve for deferred Federal income tax purposes has been described earlier in this opinion. Here, once again, we are confronted with a conflict between generally accepted accounting principles on the one hand—which may be good and prudent corporate practice by setting up of reserves to meet future contingencies—and, on the other hand, with the statutory test—surplus is to be determined by deducting from the net value of the corporation's property its *outstanding indebtedness* and paid-up capital.

Future Federal income taxes are not an outstanding indebtedness—they are a mere contingency. The fact that a tax is certain to accrue in years to come does not make it a present debt. If it did, a corporation could remove from surplus any amount of its assets by the simple expedient of setting up reserves for the payment of property taxes or for meeting other eventualities certain to occur in future years in connection with its corporate existence.

Reserves for future Federal income taxes present the same difficulty in determining the corporation's franchise privilege fee as did the use of original cost of stock in wholly-owned subsidiary companies. It cannot be too firmly stressed that the corporation franchise privilege fee is an *annual* tax. It is the tax exacted year by year for the privilege of doing business in the State of Michigan. It must be annually determined on the basis of the corporation's condition as it existed during the reporting period. If the corporation's financial condition in years past or in years to come is injected into the reporting period, the basis for the tax loses any possible rationality. The statute does not permit reserves for future contingent liabilities to be treated as outstanding debts. The disallowance by the state of the reserve for future income taxes was correct.

As shown by our prior discussion of its book-keeping entries, appellant would equate "outstanding indebtedness" with accounting liabilities. It recognizes that accelerated depreciation is no more than a device for deferring payment of Federal income taxes and does not effectuate any permanent reduction of ultimate tax liability. But appellant further argues that if we reject its claim that reserves for deferred Federal income taxes are properly excludable from surplus, nonetheless, such reserves should be approved as a proper deduction from surplus because, as a result of using the accelerated method of depreciation, there has been a loss in value of appellant's assets for future income tax deduction purposes. In effect, appellant alternatively seeks approval of these deductions from surplus as a form of valuation reserves. It argues that under the statutory definition, previously quoted, surplus means the "net value" of the corporation's property (less its outstanding indebtedness and paid-up capital) and that by using accelerated depreciation appellant will experience loss of value of its assets for future income tax deduction purposes which should be recognized by permitting charges to annual surplus—such deductions from surplus having the effect of a current reduction of net value.

From the standpoint of annual franchise privilege fee determination, there is no real distinction between appellant's claim that reserves to meet deferred Federal income taxes are an allowable deduction from surplus and its alternative claim that reserves in the same amount are deductible from surplus if carried on the corporation's books as representative of a loss in value of assets for future income tax deduction purposes. In either instance, accruals to the reserve anticipate a future condition.

As heretofore stated, the privilege fee is an annual calculation made from current values as they existed during the reporting period. For that reason, this type of bookkeeping entry is not binding on the state in its determination of corporate surplus in conformity with the statutory meaning.

In the case of *American Standard* v. *Michigan,* the judgment of the Court of Claims is reversed and the judgment of no cause for action is entered. Costs to the State of Michigan. In the case of *National-Standard* v. *Department of Treasury,* the decision of the Corporation Tax Appeal Board is affirmed. Costs to the State of Michigan.

T. E. BRENNAN, C. J., and T. M. KAVANAGH and T. G. KAVANAGH, JJ., concurred with ADAMS, J.

DETHMERS, KELLY and BLACK, JJ., did not sit in this case.