INTERNATIONAL TELEPHONE & TELEGRAPH CORPORATION v
MICHIGAN

1. TAXATION—FRANCHISE FEE—COMPUTATION—FOREIGN CORPORATION.

The State of Michigan, in applying the statutory formula for
computing franchise fees of a foreign corporation qualified and
admitted to do business in the state and specifically with
respect to the sales factor, acted properly in treating as Michi-
gan sales all tangible personal property delivered within the
state.

2. TAXATION—CORPORATIONS—FOREIGN CORPORATIONS—FRANCHISE
FEE—DOUBLE TAXATION.

Double taxation did not occur upon the application of the statu-
tory tax allocation formula with respect to the annual fran-
chise fee to be paid by a foreign corporation when certain of its
subsidiaries also paid the Michigan franchise fee, because these
subsidiaries have their own separate franchises and net worth,
are separate legal entities, and their privilege to do business in
Michigan is separate and distinct from the parent corporation.

3. TAXATION—CORPORATIONS—FOREIGN CORPORATIONS—FRANCHISE
FEE—SINGLE CORPORATE ENTITY—STATUTES.

The manner in which a foreign corporation is to operate in
Michigan is a decision for it to make within the bounds of its
charter powers; but no matter how it operates, it is a single
corporate entity and is treated as such in the statute providing
for franchise fees (MCLA 450.305).

4. TAXATION—CORPORATIONS—FOREIGN CORPORATIONS—FRANCHISE
FEE—APPORTIONMENT FORMULA—FAIRNESS—BURDEN OF PROOF.

A foreign corporation which challenges the statutory formula for
computing franchise fees has a "heavy burden" to bear to show
that the apportionment formula does not fairly represent its
Michigan activity and has not met that burden on a record
which discloses that under the Michigan formula 99-1/2% of its

REFERENCES FOR POINTS IN HEADNOTES

[1] 51 Am Jur, Taxation § 862.
[2] 51 Am Jur, Taxation § 490.
[3, 4] 51 Am Jur, Taxation §§ 839–842, 847–849.

total net worth has been excluded in assessing the Michigan Franchise Tax and shows fairness of the tax imposed (MCLA 450.305).

Appeal from the Court of Claims, Leo W. Corkin, J. Submitted Division 2 June 6, 1973, at Lansing. (Docket No. 15817.) Decided September 27, 1973. Leave to appeal denied, 391 Mich 774.

Complaint by International Telephone and Telegraph Corporation against the State of Michigan, Department of Treasury, to recover franchise fees paid under protest. Judgment for defendant. Plaintiff appeals. Affirmed.

*Raymond, Fletcher & Dillon,* for plaintiff.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Richard R. Roesch* and *Charles E. Liken,* Assistants Attorney General, for defendant.

Before: HOLBROOK, P. J., and DANHOF and ADAMS,* JJ.

ADAMS, J. This is an appeal from a decision by the Court of Claims. The opinion of Circuit Judge Leo W. Corkin, sitting in the Court of Claims, reads as follows:

"Plaintiff in this action seeks a judgment determining that the application of the statutory formula for computing franchise fees does not fairly represent the extent of its business activities within the State of Michigan and that adjustments should be made under the statutory provision of MCLA 450.305e; MSA

* Former Supreme Court Justice, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

21.208(5), and also for a judgment against defendant in the amount of $39,858.25, plus interest, for claimed excess franchise fees paid under protest. The matter was submitted to the court on stipulated facts and this serves as a basis for the court's findings.

"International Telephone and Telegraph Corporation, hereinafter referred to as 'ITT', is a Delaware corporation with its principal place of business in the City of New York, N. Y., and is the successor of ITT, a Maryland corporation and Delitt Corporation, a Delaware corporation. On July 19, 1965, ITT's predecessors were duly qualified and admitted to do business in the State of Michigan and the successor corporation, ITT, is now duly qualified and admitted to do business in Michigan.

"The franchise fees, computed and paid during the years 1966, 1967 and 1968, are measured by the financial condition of ITT as it existed on December 31, 1965, 1966 and 1967, respectively, which years are hereinafter referred to as 'annual report years 1966, 1967 and 1968.'

"At the time of filing its annual report for 1966, ITT computed and paid a franchise fee in the sum of $1,252.35. The computation of the fee was according to the statutory formula. However, ITT's intangibles, reflecting ITT's investment at cost in its subsidiaries, in the sum of $466,463,577.00, was subtracted from the fee base. The State of Michigan and Department of Treasury, defendants herein, hereinafter referred to as the 'State', subsequently reassessed the franchise fee in the sum of $14,082.43. The State's assessment was based upon computations made according to the mathematical formula set forth in the statute; MCLA 450.305; MSA 21.208. However, it included the investment, at cost, in the subsidiaries in the fee base.

"ITT subsequently submitted an amended return on a revised basis for computation of its franchise fee and in computing the fee included in both the fee base and in the denominator of the property factor of the apportionment formula the investment at cost in its subsidiaries. In addition, the wage factor was divided by three, *i.e.,* it was weighed by one-third (1/3), and the sales factor reflected intrastate sales (sales from Michigan sources to Michigan destinations) as well as sales from Michi-

gan (sales generated from the Michigan sales office). With the exceptions in the apportionment formula in regard to the property, wage and sales factors, ITT's computation was according to the method utilized by the State. The revised franchise fee amounted to $3,519.30.

"The State rejected ITT's revised computation. ITT subsequently paid the difference under protest in the sum of $13,821.08, plus interest in the sum of $924.20.

"At the time of filing its annual report for 1967, ITT computed and paid a franchise fee based upon the same method of computation described above, *i.e.,* it made adjustments in the property, wage and sales factors of the apportionment formula. The sum paid by ITT was $3,335.37. If computation of the 1967 franchise fee by ITT had been in accordance with its original method submitted on its initial 1966 annual report, as indicated above, wherein the sole adjustment was the exclusion from the fee base of its investment at cost in its subsidiaries, this would have resulted in a fee of $1,538.44.

"Subsequently, the State of Michigan assessed a fee based upon statutory construction as for 1966 in the sum of $14,035.07, plus interest of $401.24. ITT paid the difference of $10,699.70 under protest together with interest in the sum of $401.24.

"At the time of filing its annual report for 1968, ITT computed and paid a franchise fee based upon the same method of computation as for 1967, *i.e.,* it made adjustments in the property, wage and sales factors of the apportionment formula. The sum paid by ITT was $4,764.67. If computation of the 1968 franchise fee by ITT had been in accordance with its original method submitted in its initial 1966 annual report, wherein the sole adjustment was the exclusion from the fee base of its investment at cost in its subsidiaries, this would have resulted in a fee of $6,993.91.

"Subsequently, the State of Michigan assessed a higher fee, based upon statutory construction, in the sum of $20,922.90. ITT paid the difference under protest together with interest in the sum of $807.91.

"ITT's assets consist of two general categories: real

and personal properties utilized for the manufacturing and marketing of various products and product lines; and intangible personal property consisting of investment at cost in various corporations, substantially all of which are wholly owned subsidiary corporations. For annual report years 1966, 1967 and 1968, ITT's interest in its subsidiaries carried at investment cost, was as follows:

| 1966 | $466,463,577 |
| 1967 | $498,270,930 |
| 1968 | $483,225,979 |

"The certificates of stock ownership and the bonds, notes and debentures of ITT representing investments in subsidiary corporations in its investment portfolio during the years in question, were located at its home office in New York, N. Y.

"In addition to ITT, the parent corporation, the following subsidiaries of ITT have been admitted and were doing business in Michigan for the annual report years 1966, 1967 and 1968, and paid the following franchise fees during those years:

| "Corporation Subsidiaries | 1966 | 1967 | 1968 |
| --- | --- | --- | --- |
| "Federal Electric Corporation | $   10 | $   10 | $   12 |
| "Avis Rent-A-Car Systems, Inc. | 3,889 | 5,366 | 5,389 |
| "International Telephone and Telegraph Credit Corp. | 1,266 | 1,109 | 902 |
| "ITT Consumer Services | — | 2,130 | 564 |
| "ITT Systems Constructors Corp. | 10 | 10 | — |
| "ITT Terryphone Corporation | 213 | 244 | 210 |
| "Kellogg Credit Corporation | 45 | 40 | 72 |
| "Systems Installations, Inc. | 10 | 10 | 12 |
| "ITT Abrasive Products | — | 3,446 | 3,728 |
| "Hamilton Management Corp. | 33 | 85 | 103 |
| "Totals | $5,476 | $12,450 | $10,992 |

"(Dashes indicate that the corporation was not admitted or doing business in the State during that year.)

"Of the corporate subsidiaries listed in paragraph above, ITT Abrasive Products is incorporated and has its principal place of business in Michigan.

"ITT's business activities consist of two separate functions:

"(a) ITT manufactures and sells telephone, radio, electronic, and various industrial products such as

pumps and controls and related equipment and services through approximately thirty-eight divisions. These divisions are not separate corporations but are organizations within ITT created to carry out various functions with regard to a product or line of products.

"(b) ITT is a holding company for numerous subsidiaries located throughout the world to which it provides management advisory services from headquarters in New York, these services include: Legal, financial, tax, business planning, engineering, and research and development. These subsidiaries are engaged in business in widely diverse fields including automobile rentals, hotel operation, home construction and other consumer services; food processing and services; insurance and other business and financial services; defense and space programs; natural resources; education and publishing; manufacturing of consumer and industrial products such as telecommunications equipment; and operation of telephone companies. The operations of these subsidiaries are not integrated with the manufacturing and sales activities of the ITT parent corporation as set forth in subparagraph (a) above.

"For the years 1966, 1967 and 1968 ITT had dividend income from investments in subsidiaries and proceeds from the sales of investments in subsidiaries which under generally accepted accounting principles are treated as part of general working capital.

"During annual report years 1966, 1967 and 1968, divisional activities of ITT, the parent corporation, in this State were restricted to those expressly enumerated in the following paragraphs:

"ITT Nesbitt of Philadelphia, Pa., a manufacturer of water heaters and air conditioners, carried on sales activities within the State. ITT Nesbitt did not carry on any manufacturing activities, maintained no inventory and owned no real estate within the State. Tangible personal property consisted of office equipment. ITT Nesbitt employed a six-man sales staff during the years in question.

"ITT Marlow of Midland Park, N.J., and Longview, Texas, a manufacturer of water, irrigation, sewage and swimming pool pumps, had one employee in the State

of Michigan engaged in sales activities. It carried on no manufacturing activities within the State, maintained no inventory and owned no real or tangible personal property within the State.

"ITT Wire and Cable-Royal of Pawtucket, R.I., a manufacturer of wire and cable, maintained an inventory in the State. ITT Wire & Cable-Royal carried on no manufacturing or sales activities within the State and owned no real or tangible personal property other than inventory. The inventory is housed in a public warehouse in Detroit.

"ITT Bell & Gossett, of Martin Grove, Illinois, a manufacturer of pumps, motors and compressors, carried on sales activities within the State. ITT Bell & Gossett carried on no manufacturing activities, maintained no inventory and owned no real or tangible personal property within the State. ITT Bell & Gossett employed one person within the State in a sales position. ITT Bell & Gossett withdrew from the State during 1965 (annual report year 1966).

"ITT Cannon Electric of Los Angeles, California, a manufacturer of electrical connectors and related wiring devices carried on sales activities within the State with one employee. ITT Cannon Electric carried on no manufacturing activities, maintained no inventories, and owned no real or tangible personal property within the State. ITT Cannon Electric withdrew from the State during 1965 (annual report year 1966).

"ITT General Controls of Glendale, California, a manufacturer of automatic controls, carried on sales activities within the State with one employee. ITT General Controls carried on no manufacturing activities, maintained no inventories and owned no real or tangible personal property within the State. ITT Cannon Electric withdrew from the State during 1965 (annual report year 1966).

"ITT reported the following facts for purposes of apportionment. ITT through its divisions, had activities in Michigan as set forth in subparagraph (a) below. ITT through its divisions had activities everywhere as set forth in subparagraph (b) below.

"(a) MICHIGAN

| | PROPERTY | | | | WAGES | RECEIPTS | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Average Inventory | Tangible Personal Property | Rent paid or accrued × 8 | Total | | ITT METHOD | Department of Treasury METHOD |
| 1966 | $26,911 | $ 300 | $20,380 | $ 47,591 | $83,120 | $1,980,110 | $6,575,528 |
| 1967 | 71,661 | 2,750 | 40,344 | 114,505 | 75,827 | 1,890,251 | 6,626,187 |
| 1968 | 90,799 | 2,500 | 42,888 | 136,187 | 69,191 | 2,190,188 | 7,674,870 |

"(b) EVERYWHERE

| | PROPERTY | | | WAGES | RECEIPTS | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Real and Tangible Personal Property | Rent paid or accrued × 8 | Total | | Receipts From Sales | Rental and Royalties | Total |
| 1966 | $192,321,694 | $56,052,136 | $248,373,830 | $167,189,629 | $413,586,503 | $2,234,232 | $415,820,735 |
| 1967 | 280,923,859 | 64,376,120 | 345,299,979 | 174,260,831 | 464,010,454 | — | 464,010,454 |
| 1968 | 338,599,525 | 71,742,336 | 410,341,861 | 197,353,276 | 461,105,250 | 841,631 | 461,946,881 |

"In ITT's view it represents a new concept in corporate organization claiming to have two distinguishable entities. One entity is a holding company that does not carry on specific marketing, manufacturing or other operational activities, but rather, holds capital stocks, bonds and notes in subsidiaries and performs certain management functions for them. The other entity consists of operating divisions which carry on all phases of business activity, including management, manufacturing, sales and other operational activities.

"It is no doubt true that in light of the large and diverse activities of ITT's divisions and subsidiaries throughout the U.S. and foreign countries, its business activities in Michigan are minimal. Also, several of ITT's subsidiaries of the holding company entity are qualified to do business in Michigan and paid franchise fees independent of ITT.

"It is ITT's contention that its investment in subsidiaries, as shown above for the three years in question, should not be included in its net worth when applying the statutory formula for determining the franchise fee except as special adjustment provisions are applied. This is a phase of the issue presented by the case and a point of disagreement between the parties. Plaintiff would exclude all investments at cost in subsidiary corporations (which it designates "intangibles") which have no relation to the divisional operations of ITT in Michigan from the fee base, or by way of compromise use the method it used in computing its alternate tax.

"Another point of disagreement between the parties appears in their application of the 3-factor apportionment formula. They are in agreement on the property and wage factors. However, ITT would have the sales factor computed on the basis of its intrastate sales plus sales generated by its Michigan sales offices. In making its computation the State treats as Michigan sales all tangible personal property delivered to a Michigan destination.

"As applied by the State, the 3-factor formula results in an apportionment to Michigan of approximately one-half (.5%) per cent of the entire net worth of ITT. In view of the fact that more than one-half of such net worth consists of ITT's investments in subsidiaries and

affiliates, the issue of whether such apportionment offends the due process and interstate commerce provisions of the Federal Constitution is presented.

"ITT recognizes that franchise fees are imposed by the State of Michigan on corporations, both foreign and domestic, for the privilege of conducting business within the state, MCLA 450.304 [MSA 21.205]; that the franchise fee is in the amount of five mills upon each dollar of the corporation's paid-up capital and surplus, MCLA 450.304 [MSA 21.205]; that corporations that are subject to such taxes in states other than Michigan have the fee base apportioned to Michigan by multiplying the paid-up capital and surplus by a fraction consisting of three factors, to wit: property, payroll and sales, MCLA 450.305 [MSA 21.208]; and that the fee base and the three factors are defined by statute. As the court understands ITT's position it does not question the propriety or constitutionality of the three-factor apportionment as a general matter, but only as it is applied to corporations having plaintiff's particular capital structure.

"Assuming that statements made in defendants' brief are substantially correct, ITT's Michigan property factor rose from .0192% in 1966 to .0332% and .033189% in 1967 and 1968, approximately 1/30th of 1%. Its Michigan payroll factor varied between .0497% and .035059%, less than 1/20th of 1%. However, Michigan destination sales were approximately 1-1/2% of plaintiff's total receipts.

"Using the statutory apportionment formula resulted in allocation percentages of .05501% for 1966, .0516% for 1967, and .5765% for 1968. Thus it would appear that the statutory formula would attribute to Michigan approximately 1/2 of 1% of ITT's capital and surplus,

"Both parties cite from *Cleveland-Cliffs Iron Co v Corporation & Securities Commission,* 351 Mich 652 [88 NW2d 564] (1958), in support of basic principles. This case, including the dissenting opinion of three justices, extending for some 43 pages presents a very thorough discussion of the principles required for a constitutional application of the Michigan corporation franchise fee tax. However, the majority did find that certain corporate stocks of steel companies owned by the taxpayer and comprising about 27% of the taxpayer's total assets

should be included in determining book value net worth.

"In order that the issue presented in this case is kept in proper perspective, it should be kept in mind that in spite of all the argumentive emphasis on the intangibles constituting the holding company assets of ITT's business we are not dealing with a tax on tangible or intangible property. As was said in *Cleveland-Cliffs, supra* (p 680 [88 NW2d p 572]):

" 'With respect to this tax the legislature does not purport to tax any specific asset, tangible or intangible, out-State or in-State. It does not impose a tax upon steel stocks, or upon appellant's Minnesota mining properties, its fleet of vessels, its "vast" timber and ore lands, or any other specific property. What it says to the foreign corporation, simply put, is this: You are conducting activities within our borders for which we levy a franchise tax. We measure your local activities by a fair apportionment of your total value as a going concern.

" 'Such result is what our apportionment formulae seek to achieve.'

"Thus the intangibles are a factor in a formula to be used in computing the franchise fee. For this reason the case of *Norfolk & Western R Co v Missouri State Tax Commission,* 390 US 317; 88 S Ct 995; 19 L Ed 2d 1201 (1968), on which ITT places great reliance does not address itself to the issue presented in this case as it involved an ad valorem tax assessment of the plaintiff's rolling stock in the state, based on a statutory formula. Also, the factual situation would appear to this court to be substantially different from the standpoint of plaintiff's proofs.

"In *Cleveland-Cliffs, supra,* the Court attempts to define the problems to be met in satisfying the requirement of due process and the commerce clause in determining the constitutionality of a corporate franchise fee. At pages 685–686 [88 NW2d at 575] the Court says:

" 'As to the constitutional objections made, we recognize that there cannot be a sharp differentiation (save as matter of verbiage) between the due process and commerce clause arguments. There are areas of over-

lap. Nevertheless, clarity of thought may be aided by a rough separation of the problems. Put with considerable oversimplification, and yet essentially accurately, our problem in the due process area is one of legislative jurisdiction. We look to see whether or not the State has reached out beyond its territorial limits, with respect either to property or activities, in the exercise of its taxing power. The problem is one of nexus, or whether we have "a sufficiently substantial and close connection with the transaction, whether by virtue of tax benefits conferred in general police protection and otherwise or on account of ideas of territorial sovereignty concerning occurrence of 'taxable incidents' within its borders, to furnish the due process foundation necessary to sustain the exercise of its taxing power." Rutledge, J., concurring in *International Harvester Co v Department of Treasury*, 322 US 340, 356; 64 S Ct 1019, 1034; 88 L Ed 1313, 1323 (1944). As expressed by Mr. Justice Frankfurter *(Wisconsin v J C Penney Co*, 311 US 435, 444; 61 S Ct 246, 250; 85 L Ed 267, 270–271; 130 ALR 1229, 1233 [1940]), "The simple but controlling question is whether the State has given anything for which it can ask return".'

"Again at pages 690–691 [88 NW2d at 577–578] the Court says:

" 'Much of what has been said heretofore with respect to the due process clause is equally applicable to the problems presented by the commerce clause, as it is, indeed, to the problems of constitutional equality. Nevertheless there is a difference in emphasis. The commerce clause is, as a factual and economic matter, concerned with impediments to the free flow of commerce between the States. These may, of course, arise from a rapacious extra-jurisdictional levy by a taxing State, but obstruction equally effective may result from an exorbitant taxation by a taxing State having ample jurisdiction as a matter of due process, as well as by a more modest tax capable of use so cumulative as to be destructive.

" 'The commerce clause problem is this: Has this State, in imposing this tax, unduly burdened interstate commerce? What is a "burden" as the term is here employed? When is the burden "undue"? In answering

these inquiries the older cases employed a simple direct-indirect dichotomy. If the tax bore directly upon interstate commerce it was forbidden. If its impact were only remote, or indirect, it was upheld. In later years we saw the emergence of the multiple burdens theory *(Western Live Stock v Bureau of Revenue,* 303 US 250; 58 S Ct 546; 82 L Ed 823; 115 ALR 944 [1938]), though more recent decisions *(e.g., Freeman v Hewit,* 329 US 249; 67 S Ct 274; 91 L Ed 265 [1946]) cast serious question upon its present utility, suggesting, in the language of the astronomer, that we may have been viewing a nova. The problem is complicated further by the fact that differing taxes often involve entirely dissimilar considerations and result in differing impacts upon the economy. In addition, those cases involving business exclusively interstate in character *(e.g., Spector Motor Service, Inc, v O'Connor* [340 US 602; 71 S Ct 508; 95 L Ed 573 (1951)]) present unique and difficult problems not here presented to us.'

"With these principles in mind the court has also considered *National-Standard Co. v Department of Treasury,* 384 Mich 184 [180 NW2d 764] (1970), and particularly *United Air Lines Inc v Department of Treasury,* 29 Mich App 242 [185 NW2d 192] (1970).

"In *United* the Court in upholding the State's assessment of a franchise fee said (p 246 [185 NW2d p 193]):

" 'One of plaintiff's attacks on the computation of the 1967 franchise fee it paid under protest is that the fee exceeds "reasonable limits". In support of this position, plaintiff argues and the trial court found that the fee exacted is 37% of the gross revenues produced from the privilege granted by the state, *i.e.,* the right to do an intrastate business in Michigan. The flaw in this argument and the error in the trial court's finding is that it fails to take into account plaintiff's interstate business originating in Michigan, a factor plaintiff concedes to be appropriate. If the franchise fee exacted is divided by the total gross revenue of plaintiff derived from intrastate business and interstate business originating in Michigan, the fee exacted is .00264%[7] of plaintiff's gross revenue derived from intrastate business.

"[7] Upon request for rehearing, the parties acknowledge that the

Court was in error. The Michigan franchise tax exacted from United Air Lines was .264% of the gross revenues originating in Michigan, *i.e.,* it amounted to a little more than twenty-six cents for each $100 of ticket purchases in Michigan.

"In the case at bar, the franchise tax exacted by the state varies from twenty-one to twenty-eight cents for each $100 of Michigan receipts of ITT." (Footnote by the trial court.)

" 'Plaintiff's argument and the trial court's finding that application of the statutory formula to plaintiff's paid-up capital and surplus results in an apportionment to Michigan of plaintiff's paid-up capital and surplus that is disproportionate to plaintiff's business in Michigan are similarly fallacious. The argument and the finding consider only plaintiff's intrastate activity and ignore plaintiff's interstate activity originating in Michigan.

" 'We hold that application of the State formula to plaintiff's paid-up capital and surplus is within reasonable limits and that the tax rate was applied to a fair proportion of plaintiff's business done within the State of Michigan.'

"While it would appear from the facts that plaintiff's franchise fee corresponds to from 15.9% to 29.4% of its Michigan property and from 16.8% to 34.4% of Michigan wages paid, in terms of Michigan source receipts it amounts to .21¢ per $100 of receipts for 1966 and 1967 and .28¢ per $100 of receipts in 1968.

"In the opinion of the court there would appear to be nothing unreasonable or unconstitutional in using plaintiff's Michigan source receipts whether from intrastate or interstate sales as the sales factor in the statutory formula.

"Further, this court would not consider a franchise fee based on 1/2 of 1% of plaintiff's net worth as violating either due process or the commerce clause. The court would agree with defendant that the holding company phase of plaintiff's operation does in fact have a nexus in Michigan because of the supplying of 'management functions' to several subsidiaries which do business in Michigan.

"Although plaintiff's investment in subsidiaries is intangible in nature, it is a part of the corporate net

worth. In *[National-Standard v Department of Treasury], supra,* at pp 196–197 [180 NW2d at p 770], the Court said:

" 'If the money had been spent to buy stock of another company, for the construction of an industrial plant, or for the acquisition of another business, the cash invested from American Standard's treasury would still be reflected on its books as an asset, having merely been altered to another form of property.'

"In this case plaintiff, like *National-Standard* and *Cleveland-Cliffs,* acquired stock in other companies.

"ITT also claims it is being subjected to double taxation because several of its corporate subsidiaries have paid Michigan franchise fees for the years 1966, 1967 and 1968. These subsidiaries have their own separate franchises and net worth and are separate legal entities. Their privilege to do business in Michigan is separate and distinct from that of ITT. So while it is true that the franchise fee of the subsidiaries is based on their net worth which in turn is a portion of ITT's net worth, the court is of the opinion that this does not constitute double taxation to ITT.

"Judgment may enter for defendants upholding the determination and redetermination of plaintiff's franchise fee. Costs to defendants."

## *Issue I: The Taxpayer's Contentions*

We have set forth the entire Court of Claims' opinion because of its excellent statement of the facts and careful discussion of the legal issues as presented in that Court. On this appeal, we have found some difficulty in determining what the contentions of the taxpayer are. ITT sets forth three questions in its brief:

"1. In applying the statutory formula, and specifically with respect to the sales factor, was it permissible to treat as Michigan sales all tangible personal property delivered within the State?

"2. As it was applied to International Telephone and Telegraph Corporation for the involved period, was the

statutory tax apportionment formula with respect to the annual franchise fee unreasonable or unconstitutional?

"3. Did double taxation occur upon the application of the statutory tax allocation formula with respect to the annual franchise fee to be paid by International Telephone and Telegraph Corporation when certain of its subsidiaries also paid the Michigan franchise fee?"

The answer to question 1, as correctly stated by the Court of Claims, is to be found in *United Air Lines, Inc v Department of Treasury,* 29 Mich App 242; 185 NW2d 192 (1970), *leave to appeal denied* 384 Mich 837 (1971).[1] The answer to question 3 is correctly stated by the Court of Claims judge in the next to the last paragraph of his opinion. The proposition that each corporation is a separate, total entity is developed in the course of this opinion.

In its reply brief, ITT states:

"[I]t should be clear that our argument is centered upon the tax base and not one of the three factors which are taken into consideration with respect to the apportionment formula."

And again:

"Our argument is not with the factors. Rather, it is our position that the 'key' to the entire formula, that is, the tax base, must be adjusted in this case so as' to delete therefrom our investments in certain of our subsidiary corporations."

Later in its reply brief, the taxpayer asserts:

[1] Appeal to the United States Supreme Court was dismissed November 9, 1971 for want of a substantial Federal question. 404 US 931; 92 S Ct 283; 30 L Ed 2d 245 (1971). *See also Matson Navigation Co v State Board of Equalization,* 297 US 441; 56 S Ct 553; 80 L Ed 791 (1936).

"[B]oth of our characteristics, that is, non-unitary and multiform, preclude taking into consideration all of our paid-up capital and surplus in the tax base."

The taxpayer further argues:

"[C]apital outside of a state can be considered in computing a corporate franchise tax only if the business involved is a unitary enterprise."

Consequently, we conclude that the issue before us is that stated in question 2 of the taxpayer's brief, as more explicitly set forth in the above quotations from ITT's reply brief.

*Issue II: Unitary versus Multiform Corporations*

ITT bases its claim for relief upon the provisions of MCLA 450.305; MSA 21.208, which read as follows:

"(5) If the allocation and apportionment provisions of this act do not fairly represent the extent of the taxpayer's business activity in this state, the taxpayer may petition for or the department may require, in respect to all or any part of the taxpayer's business activity, if reasonable:

"(a) Separate accounting;

"(b) The exclusion of any 1 or more of the factors;

"(c) The inclusion of 1 or more additional factors which will fairly represent the taxpayer's business activity in this state; or

"(d) The employment of any other method to effectuate an equitable allocation and apportionment of the taxpayer's income.

"An alternative method will be effective only with prior approval of the commission."[2]

While ITT engages in business in 57 countries and in virtually all of the 50 states, its business activities, as detailed by Judge Corkin, consist of two separate functions. First, as an operating company it functions through approximately 38 divisions which are not separate corporations. Second, as a holding company it operates through numerous subsidiary corporations whose operations are not integrated with the manufacturing and sale activities of the parent corporation, but which subsidiaries receive certain management advisory services from ITT's headquarters in New York.[3] Fifty per cent of ITT's net worth is attributable to subsidiary corporations. Each subsidiary doing business in Michigan is paying its own franchise taxes. Since the businesses of the various subsidiaries are non-unitary with the business of ITT, carried on through its divisions, it is ITT's position that its investments in the subsidiary corporations should be eliminated from the tax base.

ITT's position is probably best stated by Mr. Justice Holmes in *Wallace v Hines,* 253 US 66, 69–70; 40 S Ct 435, 436–437; 64 L Ed 782, 786 (1920). In that case, North Dakota attempted to levy an excise tax by a formula which assessed a portion of the railroad's total property equal to the proportion of its main trackage within the state to its total main trackage. Justice Holmes wrote:

[2] There is no showing in this case that the taxpayer sought prior approval of the Michigan Corporation and Securities Commission to use an alternative method to compute the tax. No issue has been raised as to the failure of ITT to seek prior approval of the commission. Since our holding is adverse to ITT, the procedural question need not be considered.

[3] Unlike the trial judge, we do not find it necessary to determine whether these activities establish a nexus between Michigan and the operations of the subsidiary corporations.

"The only reason for allowing a state to look beyond its borders when it taxes the property of foreign corporations is that it may get the true value of the things within it, when they are part of an organic system of wide extent, that gives them a value above what they otherwise would possess. The purpose is not to expose the heel of the system to a mortal dart—not, in other words, to open to taxation what is not within the state. Therefore no property of such an interstate road situated elsewhere can be taken into account unless it can be seen in some plain and fairly intelligible way that it adds to the value of the road and the rights exercised in the state. Hence the possession of bonds secured by mortgage of lands in other states, or of a land grant in another state, or of other property that adds to the riches of the corporation, but does not affect the North Dakota part of the road, is no sufficient ground for the increase of the tax—whatever it may be—whether a tax on property, or, as here, an excise upon doing business in the state."

Other cases cited by ITT place even greater stress upon the concept that a state may tax only the operation within the state. For instance, in *Commonwealth v Kirby Estates, Inc,* 432 Pa 103; 246 A2d 120 (1968), the taxpayer, primarily a holding company, had made an investment in Pennsylvania real estate. The Pennsylvania Court found that the taxpayer's presence in Pennsylvania was limited to the ownership of real estate unconnected with its ownership of stocks. The Court concluded that the state franchise tax could only be applied to that part of the corporation's business done in Pennsylvania since the operations outside Pennsylvania were wholly unrelated. Its $77,565.57 investment in Pennsylvania had produced a net income of $646.82 and a Pennsylvania franchise tax of $3954.74. See also *Commonwealth v Columbia Gas & Electric Corp,* 336 Pa 209; 8

A2d 404 (1939); *Morewood Realty Corp v Commonwealth,* 6 Pa Commw 244; 294 A2d 219 (1972).

In the case of *Hans Rees' Sons, Inc v North Carolina,* 283 US 123, 135; 51 S Ct 385, 389; 75 L Ed 879, 908 (1931), the formula which North Carolina attempted to use to assess an income tax in connection with the manufacturing business of the appellant in North Carolina was found by the United States Supreme Court to be "a percentage of income out of all appropriate proportion to the business transacted by the appellant in that state". In that case, the manufacturing business of the appellant extended over several states, and North Carolina's formula attempted to tax practically all of the corporation's income to North Carolina. The case can, of course, be distinguished from the present one because of the nature of the tax, but it does illustrate the broad general principle that a state may tax only that which pertains to the state.

Again, in *Norfolk & W R Co v Missouri State Tax Commission,* 390 US 317, 326; 88 S Ct 995, 1002; 19 L Ed 2d 1201, 1208 (1968), a state ad valorem tax on the railroad's rolling stock within the state was stricken down for the reason that "rigid application of the mileage formula led to a grossly distorted result".

While the above cases and numerous others, irrespective of the particular kind of tax, stress the concept that a state's taxing power stops at its borders, there has been a steady liberalization in legal interpretation of the ways in which a state may formulate its own statutes to tax businesses which operate within the state. For example, in *Butler Bros v McColgan,* 315 US 501, 506; 62 S Ct 701, 704; 86 L Ed 991, 995–996 (1942), the formula used by California to assess a franchise tax con-

verted an $82,851 loss (based on separate book-keeping by the corporation of its operations within the state) into a $93,500 profit. The United States Supreme Court said:

"We read the statute as calling for a method of allocation which is 'fairly calculated' to assign to California that portion of the net income 'reasonably attributable' to the business done there."

The Court held that it was proper to take into account, based upon unity of use and management, the business of the corporation both inside and outside of the state.

Turning to Michigan cases, as Judge Corkin concluded, probably the key case is *Cleveland-Cliffs Iron Co v Corporation & Securities Commission,* 351 Mich 652; 88 NW2d 564 (1958). In that case, the Michigan Supreme Court considered the wider-anging nature of the various business activities of Cleveland-Cliffs, noting that the corporation was carrying on extensive operations in iron ore, coal, a steamship line, and timber, as well as being involved in a chemical company, a power and light company, a hospital, a motel, a real estate company, and so on. The Court concluded (p 670; 88 NW2d p 567) that Cleveland-Cliffs was "an extensive economic complex" and that all of the operations of the corporation, including its holdings in steel stocks, could be taken into account in determining the Michigan business activity tax. The Court considered whether Cleveland-Cliffs' business activity was unitary and concluded (p 683; 88 NW2d p 574) that it would characterize the business as such "were the issue here controlling". However, the Court went on to find (p 684; 88 NW2d p 574) "that the unitary concept does not here control". The tax, computed on a formula

taking into account all operations of Cleveland-Cliffs, was upheld. Judge Corkin has ably analyzed and extensively quoted from this case so that it requires no further comment here.

In *Wisconsin & Michigan Steamship Co v Corporation & Securities Commission,* 371 Mich 61; 123 NW2d 258 (1963), Justice SOURIS pointed out that *Duluth, SS & AR Co v Corporation & Securities Commission,* 353 Mich 636; 92 NW2d 22 (1958), severely limited the earlier and more restrictive decisions in *Gartland Steamship Co v Corporation & Securities Commission,* 339 Mich 661; 64 NW2d 886 (1954), and *Panhandle Eastern Pipe Line Co v Corporation & Securities Commission,* 346 Mich 50; 77 NW2d 249 (1956). Justice SOURIS wrote (pp 71–72, 73; 123 NW2d pp 263, 264):

"Whether or not the privilege granted a taxpayer to do an intrastate business is exercised has nothing whatever to do with the right of a state, unhampered by the commerce clause, to charge for such privilege a fee based upon a reasonably allocated portion of the taxpayer's capital and surplus. What Michigan says to the taxpayer, in effect, is this: 'Separate and apart from your unquestioned right to exercise your corporate franchises in interstate commerce within this State, without imposition by this State of a fee for the exercise of that right, you may also pursue your business within this State in matters not involving interstate commerce, but only upon payment of a fee for that privilege. That fee will be measured by determination of that portion of your total paid-up capital and surplus available for such intrastate business, whether or not the privilege actually is exercised by you.'

\* \* \*

"There is no constitutional reason, absent discrimination between domestic and foreign corporations, why a state may not determine corporate franchise fees on the basis of the potential capital,—the financial power or capital potency,—reasonably available to a corporation

for use within the taxing jurisdiction, whether or not actually so used."[4]

A corporation is a single entity capable of functioning in protean fashion. The various forms and shapes it may take are practically unlimited, as are its methods and modes of operation. It may elect to carry on a completely integrated vertical operation from raw material to finished product by means of a single corporate entity, or may utilize separate divisions, or may create subsidiary corporations for each phase of its operations. It may operate as a manufacturer of a single specialty product, or of many products; as a wholesaler or retailer in one or many products; as an owner of other corporations—the possibilities are practically without limit. *How* a corporation is to operate is a decision for it to make within the bounds of its charter powers. So, in the case of ITT, its decision to operate along two broad general lines was one made by it, certainly not by the State of Michigan. The ultimate fact is that, no matter how it operates, it is a single, corporate entity and is treated as such in the statute. See *National-Standard Co v Department of Treasury,* 384 Mich 184, 198–204; 180 NW2d 764, 770–773 (1970).

If a state were obliged each year to make an analysis of the nature of a corporation's various operations and then determine the corporate franchise fee accordingly, the task would be practically insuperable in view of the complexity of corporate operations and the many forms they may assume.[5] For this reason we think that the State of Michigan has wisely decided to treat each corporation as

---

[4] *See F W Woolworth Co v Director of Division of Taxation,* 45 NJ 466; 213 A2d 1 (1965).

[5] *See National-Standard Co. v Department of Treasury,* 384 Mich 184, 192; 180 NW2d 764, 767–768 (1970).

a separate entity. The corporation determines what form or structure it will assume. The formula for determining a franchise tax is up to the state, providing always the formula results in a fair franchise fee.

ITT opens its reply brief with this statement:

"The appellees erroneously declared that the constitutionality of the statute *per se* had been placed in issue. As noted on page 15 of our brief, we specifically declined to make such an argument. Rather, it is our position that the *mechanical application of the apportionment formula,* as urged by the appellees, would be unconstitutional in this case due to its particular facts." (Emphasis added.)

This leads us to an analysis of the application of the apportionment formula.

## *Issue III: The Heavy Burden*

In *Norfolk & W R Co v Missouri State Tax Commission, supra,* the United States Supreme Court found the statutory formula to be unconscionable under the facts in that case, but noted that when a taxpayer challenges a formula it has a "heavy burden" to bear.[6]

ITT, while conceding that the "application of the apportionment formula" is the test of constitutionality, has declined this burden, stating in its reply brief as follows:

"In light of the above legal propositions and conclusions, there is no need to engage in a 'numbers game' and we respectfully decline the appellees' invitation to do so. By emphasizing statistics, the appellees have lost sight of the relevant legal restrictions on taxation involved and presented in this case."

---

[6] For a statement to like effect, *see Butler Bros v McColgan,* 315 US 501, 507; 62 S Ct 701, 704; 86 L Ed 991, 996 (1942).

In view of ITT's position, we content ourselves with these short excerpts from the brief of the Attorney General analyzing the application to ITT of the apportionment formula:

"The franchise tax demanded by the Michigan statute corresponds to 29.4% of ITT's Michigan property in 1966, 12.3% of its Michigan property in 1967, and 15.9% of its property in 1968. The fee, as a percentage of the Michigan wages paid by ITT is of similar significance, varying from 16.8% to 34.4%. However, in terms of Michigan-source receipts of ITT, the state demands as franchise tax twenty-one cents for each $100 of receipts in the years 1966 and 1967, and twenty-eight cents per $100 of those receipts in 1968.[7]

\* \* \*

"If we examine this in another light, we see that ITT's Michigan property factor rose from .0192% in 1966 to .0332% in 1967 and .033189% in 1968; approximately 1/30th of 1%. Its Michigan payroll factor varied between .0497% and .035059%; less than 1/20th of 1%.

"On the other hand, Michigan destination sales were approximately 1-1/2% of its entire receipts.

"Mathematical addition of the three factors and division of the aggregation by the number of factors [three] result in a Michigan allocation percentage for ITT for the years 1966, 1967 and 1968 amounting to .05501%, .5016% and .5765% respectively. In other words, formulary apportionment, as provided by the Michigan franchise tax law attributes to this State approximately one-half of 1% of ITT's capital and surplus."

In this case, the burden was upon ITT to show that the apportionment formula does not fairly

---

[7] *See* footnote 1, *supra,* and *United Air Lines, Inc v Department of Treasury,* 29 Mich App 242; 185 NW2d 192 (1970). The Michigan franchise fee exacted from United Air Lines was .264% of the gross revenues originating in Michigan, *i.e.,* the fee amounted to a little more than 26¢ for each $100 of ticket purchases in Michigan. The parties in the instant case point out that the figure appearing in the *United* opinion (.00264%) is erroneous, and agree that .264% is correct. (Footnote by the author of this opinion.)

represent its Michigan activity. Under Michigan's formula, 99-1/2% of ITT's total worth has been excluded in assessing the Michigan franchise tax. The trial judge has ably analyzed the fairness of the tax imposed. We agree with his analysis.

The Court of Claims is affirmed. Costs to defendants.

All concurred.