UNITED ARTISTS CORPORATION v DEPARTMENT OF
TREASURY

1. TAXATION—CORPORATIONS—OWNERSHIP OF PROPERTY.

A corporate taxpayer's books and records do not represent a
talisman for ascertaining the tax owed by it; a basic tenet in
tax law is that courts will look to the substance of an arrange-
ment between a taxpayer and another party rather than its
form to ascertain who is the real owner of property for taxation
purposes.

2. TAXATION—CORPORATIONS—FRANCHISE TAXES—MOTION PICTURE
   DISTRIBUTORS—MOTION PICTURE PRODUCERS—OWNERSHIP OF
   PROPERTY.

A motion picture distribution company owns, for corporation
franchise tax purposes, films which are produced by indepen-
dent producers, even though the company reported its arrange-
ments with its producers as accounts receivable, where the
company obtains sole and exclusive control over the films when
completed by the producers, the company distributes the films,
pays the costs of the films, and bears any loss without recourse
to the producers.

Appeal from Corporation Tax Appeal Board.
Submitted November 5, 1975, at Lansing. (Docket
No. 22881.) Decided December 10, 1975.

The Corporation Franchise Fee Division of the
Department of Treasury determined that United
Artists Corporation owed additional franchise
taxes. Deficiency assessment upheld by the Deputy
State Treasurer on redetermination. The Corpora-
tion Tax Appeal Board affirmed. United Artists
appeals by leave granted. Reversed.

REFERENCES FOR POINTS IN HEADNOTES
[1] 71 Am Jur 2d, State and Local Taxation § 254 et seq.
[2] 71 Am Jur 2d, State and Local Taxation § 266 et seq.

*Hyman & Rice (Donald Schiff,* of counsel), for United Artists Corporation.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Richard R. Roesch* and *Charles E. Liken,* Assistants Attorney General, for the Department of Treasury.

Before: ALLEN, P. J., and BRONSON and R. M. MAHER, JJ.

ALLEN, P. J. Taxpayer, United Artists Corporation, appeals by leave granted from the September 12, 1974 decision of the Corporation Tax Appeal Board [CTAB] upholding the determination by the Corporation Franchise Fee Division [CFFD] that taxpayer owed additional franchise taxes for 1965 through 1970.

Taxpayer, a Delaware corporation with principal offices in New York City and authorized to conduct business in Michigan, is in the motion picture business. Following an audit of taxpayer's books and records in August 1971, CFFD determined that taxpayer improperly included certain monetary advances made to independent film producers in the property factor of the apportionment formula used in computing its franchise taxes for the years 1965–1970, and sent taxpayer a notice of deficiency in the amount of $4,480.91. Taxpayer's request for a redetermination hearing was honored on January 18, 1973, and the Deputy State Treasurer issued an order of redetermination on September 4, 1973, upholding the deficiency assessment. On appeal, CTAB affirmed. Pertinent facts stated in the CTAB's opinion adequately sets the stage for resolution of the instant dispute:

"The appellant contends that it produces motion

pictures pursuant to contracts with producers which call for the production of pictures by the producers with funds that are furnished by United, or obtained by the producers from lending institutions under guarantee of United.

"The films are distributed by United under agreements by which it is understood that if the pictures do not generate sufficient revenue to enable the producers to pay off the loans advanced either by United or by the bank (but guaranteed by United) the producers shall have no personal obligation to repay any unrecouped amount. If a picture is capable of recouping its production cost, then any profits earned by the picture are shared between the producer and United, at an agreed percentage.

"On its books and records United has reflected the amounts advanced to the producers, or to the banks in repayment of their advances to producers, as accounts receivable. As funds were available from distribution for amortization of the producer's debt, they were so applied, and if the picture turned out to be a loss picture, the remaining balance was written off as a bad debt."

In addition, the taxpayer's annual report to its shareholders carried the production loans as an asset under "advances and investments". A copy of the contract between taxpayer and an independent producer, which was certified as being typical of those production and distribution agreements involving taxpayer, provides *inter alia* that the advances are money loans from taxpayer and that "this agreement is a security agreement" with taxpayer as the secured party.

Based upon its findings that taxpayer's contracts with independent film producers were financing and distribution agreements, that the advances were carried on taxpayer's books and records as accounts receivables, and that the annual shareholders report listed the advances as "advances

and investments", the CTAB concluded that the redetermination order by the Department of Revenue correctly excluded the value of the production costs from the property factor of the apportionment formula.

Relying primarily upon the Federal Tax Court's decision in *Carnegie Productions, Inc v Commissioner of Internal Revenue,* 59 TC 642 (1973), taxpayer contends that because it assumed all financial risks, the films are realistically its property, rightly included in the property factor of the apportionment formula. Moreover, taxpayer claims that the independent producers are no more than cameras for hire, and the CTAB exalted form over substance in stressing the labels used in its books and records, annual reports to shareholders, and contracts.

Appellee argues that the documents upon which the advances are predicated, the use of accounts receivable on taxpayer's books and records, and the listing of the funds as "advances and investments" in the annual report to the shareholders, reflect that the nature of taxpayer's interest in the films is one of security.[1] It claims that the taxpayer's degree of risk is no greater than other financial institutions, and points out that *Carnegie, supra,* involved Federal income taxes, not a franchise tax which by statute is based upon the corporation's net worth as per its books and records. Further, appellee points out that, unlike the instant taxpayer, the film distributor in *Carnegie,*

---

[1] Contrary to appellee's suggestions, the decision in *International Telephone & Telegraph Corp v Michigan,* 50 Mich App 5; 213 NW2d 226 (1973), is inapposite to the issue currently before this Court. That case concerned, among other things, a dispute over corporate form of the taxpayer as it related to the franchise fee base, and not what was or was not tangible property of the corporation for the purpose of the apportionment formula.

*supra,* had the right to "otherwise dispose of the film upon completion".

MCLA 450.304; MSA 21.205 required any profit corporation organized or authorized to do business in this state to pay, at the time it files a Michigan annual report, a privilege tax equal to five mills[2] for each dollar of its paid-up capital and surplus. MCLA 450.305; MSA 21.208 outlined the method to be utilized in computing the annual franchise tax for corporations doing business in more than one state by apportioning the share of their paid-up capital and surplus that corresponds with their Michigan business activity. The formula is partly based on a property factor which is a fraction—the numerator being the average value of real and tangible personal property owned by taxpayer in Michigan, and the denominator representing the average value of all real and tangible personal property owned by the corporate taxpayer.[3] By increasing the size of the denominator (which would be increased if the films are treated as part of all personal property owned by plaintiff) the resulting fraction is made smaller and consequently the tax imposed by the State of Michigan is decreased.

MCLA 450.82; MSA 21.82[4] provided that a corporation's annual report filed with the state must contain *inter alia* the following information:

---

[2] Since changed to 4.75 mills. MCLA 450.304; MSA 21.205 was repealed by 1975 PA 230, effective May 14, 1977. *See* 1974 PA 34, 1974 PA 126, and 1975 PA 230.

[3] The remaining factors—payroll and sales—are similarly computed. The three factors are then added together, divided by three, and the product is applied to the corporation's total paid-up capital and surplus to determine the Michigan share on which the five-mill fee is assessed.

[4] This provision was superseded by 1972 PA 284 effective January 1, 1973, and contains essentially the same requirements. MCLA 450.1911; MSA 21.200(911).

"A complete and detailed statement of the assets and outstanding liabilities of the corporation as shown by the books of such corporation, at the close of business on December 31 or upon the date of the close of its first fiscal year, next preceding, which shall be the same balance sheet statement as furnished to shareholders, as provided by law."

In *In re Appeal of Hoskins Mfg Co,* 270 Mich 592, 597; 259 NW 334 (1935), our Supreme Court construed the language of MSA 21.82 to mean that:

"Obviously, the source of information and facts is the corporate books, which the statute assumes, and requires, shall be kept correctly. Obviously, also, the books represent the action of the corporation in valuing its assets and it has little cause to complain of such book values."

The CTAB quoted the above language in its decision, and appellee relies heavily upon it to support the position that taxpayer is bound by what is in its books. However, the Court in *Hoskins, supra,* 598, went on to state that:

" 'Determination' implies judgment and decision after weighing the facts. The duty to fix the tax has a *quasi*-judicial tinge.

"Undiscriminating adherence to some of the figures on a balance sheet cannot reasonably be made the measure of the tax. Because of the various reports and taxes required from corporations and the development of accounting and auditing along mysterious lines, the books and the balance sheet may have strange items and need interpreting. In *In re [Detroit] International Bridge Co,* 257 Mich 52, 58 [240 NW 68 (1932)], this court found an item which was carried as an asset but in fact was not one, and which it held should not be included in the computation of the tax.

"The situation at bar is another illustration of the need for 'determination'."

Thus, taxpayer's books and records do not represent a talisman for ascertaining the tax owed by it. Further, it is a basic tenet in tax law that courts will look to the substance of an arrangement rather than its form to ascertain who is the real owner of property. See *City of Ann Arbor v The University Cellar, Inc,* 65 Mich App 512; 237 NW2d 535 (1975).

It is undisputed that motion pictures are tangible personal property properly taxable under the formula set forth for the franchise tax. MCLA 450.305; MSA 21.208. In dispute is whether for tax purposes the ownership of the films is in fact in United Artists or in the producers. Stated another way, the issue is whether the degree of United's interest in the films is sufficient to include the value of the films within the property factor of the franchise tax apportionment formula or is it merely an intangible receivable account?[5]

If we look to form only as represented by the taxpayer's books the answer is that the films are intangible receivables. Understandably this is the way the Treasury Department viewed the situation upon examining the taxpayer's books. But if we look, as we must look under the tax law, at the substance of the arrangement between the taxpayer and the various producers we find that the taxpayer's interest in the films is substantially more than that of a lending institution and is substantially more than the incidents of ownership in the producer. The producer delivers the completed film to the taxpayer who obtains *sole and exclusive control* over the film. Distribution is made by the taxpayer and not by the producer.

---

[5] Owing to our disposition of the case, we need not confront the question whether the "production loans" to independent producers constitute rent which may be capitalized in computing taxpayer's franchise tax.

The costs of the film are paid by the taxpayer even if the producer suffers a loss. The taxpayer bears any loss, *without recourse* to the producer. Therefore the producer undertakes no risk of loss at all. Thus, despite the contractual clauses which at various paragraphs refer to "production loans", "completion loans" and selling pledged collateral—clauses upon which CFFD relied for holding against taxpayer—there is in reality no true receivable. Accordingly, we are persuaded that the realities of the situation establish that taxpayer holds the significant and valuable incidents of ownership in the motion picture films and reject appellee's argument that the taxpayer is conclusively bound by the labels used in its books.

The decision in *Carnegie Productions, Inc v Commissioner of Internal Revenue,* 59 TC 642 (1973), lends persuasive support to the conclusion we have reached. There, a producer of motion pictures maintained that it, not the distributor of films, owned the subject motion picture thereby entitling it to amortize the value of the film for Federal income tax purposes. After stating the facts and referring to the applicable tax statutes, the Tax Court said:

"The respondent argues that Columbia [the distributor] was the real 'owner' of the picture. The petitioner was merely an independent contractor engaged by Columbia to produce a picture. Columbia put up all the money. Once the picture was completed, petitioner was left with bare legal title and the right ultimately to share in any profits from the distribution of the picture. Since the petitioner invested nothing for that right, the respondent contends that the petitioner had nothing to depreciate." 59 TC at 651.

Notwithstanding that the producer held legal title

to the picture, the Tax Court concluded that the real owner for tax purposes was the distributor. Although not identical, the important and determinative provisions of the production-distribution agreement in *Carnegie* concerning financial risk, control of the film after production, disposition of proceeds, and interest in any profits, are very similar to the agreements under consideration here. Had a respective *producer* been the taxpayer involved in this case, appellee could justifiably rely on *Carnegie* for the position that a film (or films) is not in substance the tangible personal property of the producer. The shoe being on the other foot, so to speak, this Court will not ignore the persuasive judicial authority represented by *Carnegie* simply because it involved Federal income tax law. The decision of the Corporation Tax Appeal Board is reversed.

Reversed.